UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| VICTOR N. PELICANO | : |
| | : |
| v. | :    C.A. No. 05-314A |
| | : |
| JO ANNE B. BARNHART, | : |
| Commissioner of the Social Security | : |
| Administration | : |

**MEMORANDUM AND ORDER**

This matter is before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"), 42 U.S.C. § 405(g). Plaintiff filed his Complaint on July 18, 2005 seeking to reverse the decision of the Commissioner or, in the alternative, to remand for further proceedings. Plaintiff filed a Motion for Summary Judgment on May 8, 2006. The Commissioner filed a Motion for an Order Affirming the Decision of the Commissioner on June 14, 2006.

With the consent of the parties, this case has been referred to me for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Based upon my review of the entire record, independent legal research, and the legal memoranda filed by the parties, I find that there is substantial evidence in the record to support the Commissioner's decision and findings that Plaintiff is not disabled within the meaning of the Act. Consequently, I order that the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Document

No. 8) be GRANTED and that Plaintiff's Motion for Summary Judgment (Document No. 7) be DENIED.

## I.      PROCEDURAL HISTORY

Plaintiff filed applications for SSI and DIB on March 16, 2003, alleging an inability to work since June 14, 2002. (Tr. 60-63, 345-346). The applications were denied initially (Tr. 29, 31-35) and on reconsideration. (Tr. 30, 40-42, 350-354). Plaintiff requested an administrative hearing. (Tr. 43). On October 8, 2004, a hearing was held before Administrative Law Judge Barry H. Best (the "ALJ"), at which Plaintiff, represented by counsel and a vocational expert appeared and testified. (Tr. 358-395). On January 19, 2005, the ALJ issued a decision finding that Plaintiff was not disabled. (Tr. 13-28). The Appeals Council denied Plaintiff's request for review on May 25, 2005, thus making the ALJ's decision the final decision of the Commissioner. (Tr. 8-11). A timely appeal was then filed with this Court.

## II.     THE PARTIES' POSITIONS

Plaintiff argues that the ALJ failed to give proper weight to the opinion of his treating physicians. Plaintiff also argues that there is substantial evidence in the record that, in light of the vocational expert's testimony, leads to the conclusion that he is disabled and justifies an award of benefits.

The Commissioner disputes Plaintiff's claims and argues that there is substantial evidence in the record to support the ALJ's finding that Plaintiff is not disabled because he retained the RFC to perform a range of work at the light exertional level that allowed him to perform jobs that existed in significant numbers in the national economy.

### III.   THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (*per curiam*); Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Where the Commissioner's decision is supported by substantial evidence, the court must affirm, even if the court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

The court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law. Nguyen v. Chater, 172 F.3d  31, 35 (1st Cir. 1999) (*per curiam*); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) citing, Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985).

The court may remand a case to the Commissioner for a rehearing under sentence four of 42

U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. Seavey, 276

F.3d at 8.  To remand under sentence four, the court must either find that the Commissioner's

decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the

law relevant to the disability claim. Id.; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980)

(remand appropriate where record was insufficient to affirm, but also was insufficient for district

court to find claimant disabled).

Where the court cannot discern the basis for the Commissioner's decision, a sentence four

remand may be appropriate to allow her to explain the basis for her decision.  Freeman v. Barnhart,

274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under sentence four, the ALJ should review the

case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726,

729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals

Council).  After a sentence four remand, the court enters a final and appealable judgment

immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court...may at any time order additional evidence to be taken
> before the Commissioner of Social Security, but only upon a showing
> that there is new evidence which is material and that there is good
> cause for the failure to incorporate such evidence into the record in a
> prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: (1) that there is new,

non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a

reasonable possibility that it would change the administrative result; and (3) there is good cause for

-4-

failure to submit the evidence at the administrative level.  See Jackson v. Chater, 99 F.3d 1086, 1090-92 (11th Cir. 1996).

A sentence six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant.  Jackson, 99 F.3d at 1095.  With a sentence six remand, the parties must return to the court after remand to file modified findings of fact.  Id.  The court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.  Id.

## IV.    DISABILITY DETERMINATION

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

### A.    Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).  The ALJ may

discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20

C.F.R. § 404.1527(e). <u>See also</u> <u>Dudley v. Sec'y of Health and Human Servs.</u>, 816 F.2d 792, 794 (1st Cir. 1987).

**B.      Developing the Record**

The ALJ has a duty to fully and fairly develop the record.   <u>Heggarty v. Sullivan</u>, 947 F.2d 990, 997 (1st Cir. 1991).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right if counsel is not retained.  <u>See</u> 42 U.S.C. § 406; <u>Evangelista v. Sec'y of Health and Human Servs.</u>, 826 F.2d 136, 142 (1st Cir. 1987).  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  <u>Id.</u>  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  <u>See Heggarty</u>, 947 F.2d at 997, <u>citing</u> <u>Currier v. Sec'y of Health Educ. and Welfare</u>, 612 F.2d 594, 598 (1st Cir. 1980).

**C.      Medical Tests and Examinations**

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; <u>see also</u> <u>Conley v. Bowen</u>, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. <u>Carrillo Marin v. Sec'y of Health and Human Servs.</u>, 758 F.2d 14, 17 (1st Cir. 1985).

### D.     The Five-step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering her RFC, age, education and past work) prevent her from doing other work that exists in the national economy, then she is disabled.  20 C.F.R. § 404.1520(f). Significantly, the claimant bears the burden of proof at steps one through four, but the Commissioner bears the burden at step five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five-step process applies to both SSDI and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant bears the ultimate burden of proving the existence of a disability as defined by the Social Security Act. Seavey, 276 F.3d at 5. The claimant must prove disability on or before the last day of her insured status for the purposes of disability benefits. Deblois v. Sec'y of Health and Human Servs., 686 F.2d 76 (1st Cir. 1982), 42 U.S.C. §§ 416(I)(3), 423(a), (c). If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability. Id.

### E.    Other Work

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. Seavey, 276 F.3d at 5. In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids"). Seavey, 276 F.3d at 5. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. Id.; see also Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills. Nguyen, 172 F.3d at 36. In almost all of such cases, the

Commissioner's burden can be met only through the use of a vocational expert. Heggarty, 947 F.2d at 996.  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

### 1.    Pain

"Pain can constitute a significant non-exertional impairment."  Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

> (1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

-10-

(3) Type, dosage, effectiveness, and adverse side-effects of any pain medication;

(4) Treatment, other than medication, for relief of pain;

(5) Functional restrictions; and

(6) The claimant's daily activities.

Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

## 2. Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Rohrberg, 26 F. Supp. 2d at 309. A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See Frustaglia, 829 F.2d at 195. The failure to articulate the reasons for discrediting subjective pain testimony can require remand so that the ALJ may "make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]." DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24, 26 (1st Cir. 1986).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the

-11-

implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

## V.     APPLICATION AND ANALYSIS

Plaintiff was forty-eight years old at the time of the ALJ hearing. (Tr. 61, 366). He has a high school education (Tr. 78, 367) with twenty years of past relevant work as a machine operator. (Tr. 73, 367-368). The VE testified that this was skilled work at the medium exertional level. (Tr. 390).

Plaintiff alleges that he became disabled in June 2002, even thought he suffered from various medical conditions before that date. (Tr. 61, 72). Plaintiff claims that prior to June 2002, his medical conditions did not prevent him from being able to work. Therefore, despite these earlier medical problems, he continued to work until June 2002. Plaintiff then received "TDI" as well as a temporary disability benefit through his employer for a period after June 2002. (Tr. 369, 372-373). Since that time, Plaintiff has been financially supported by his wife who works as a public middle school teacher. (Tr. 373).

Since at least 1998, Plaintiff has been treated by Dr. Hugo M. Yamada who specializes in internal medicine. (Tr. 109). In January 1998, Plaintiff complained of dyspnea (shortness of breath) on exertion (climbing a flight of stairs) and chest pain. Dr. Yamada diagnosed hypertension, high cholesterol and blood in Plaintiff's stool. (Tr. 109-110).

In May 1998, Dr. Thomas E. Noonan of Blackstone Cardiology Associates saw Plaintiff after he had been admitted to The Memorial Hospital with complaints of left arm numbness. (Tr. 141). Plaintiff also complained of continued dyspnea on heavy exertion. An echocardiogram showed a

moderate eccentric aortic insufficiency with at least a moderate LV dysfunction and an extreme concentration of lipids in his plasma. Id. Dr. Noonan opined that Plaintiff's conditions was most likely caused by "significant alcohol intake" and counseled him "extensively" on the need for "complete abstinence with respect to alcohol intake." Id.

Plaintiff underwent aortic valve replacement surgery at The Miriam Hospital in July 1998 on referral from Dr. Noonan. (Tr. 159-171). On August 11, 1998, Dr. Noonan examined Plaintiff and reported that he was doing "extremely well" since the aortic valve replacement. (Tr. 142). Dr. Noonan noted that an echocardiogram performed in August 1998 showed that Plaintiff's aortic valve prosthesis was functioning normally, that he continued to do well in October 1998 and January 1999 with respect to the aortic valve replacement, that he had only minimal dyspnea on exertion and in January 1999 his blood pressure was well controlled. (Tr. 143, 144).

In February 1999, Plaintiff complained to Dr. Yamada of fatigue, memory impairment, forgetfulness, depressed mood, irritability, daily agitation and no energy. Dr. Yamada prescribed Wellbutrin, an antidepressant. (Tr. 122). When Plaintiff returned to Dr. Yamada on April 28, 1999, he wanted to discontinue using Wellbutrin, he felt well and his mood was stable after having taken Wellbutrin for two months. (Tr. 124).

In July 1999, Plaintiff reported a depressed mood, difficulty concentrating and memory problems, but Dr. Yamada's psychological examination of him was normal, except that depression and a flat affect was noted. (Tr. 127-128). Dr. Yamada's review of Plaintiff's psychological symptoms in October 1999 was normal. (Tr. 131).

-13-

On February 2, 2000, Dr. Yamada's nurse practitioner reported that Plaintiff was physically unable to work until February 5, 2000, as the result of an upper respiratory infection and bronchitis. (Tr. 176).

In February 2001, Plaintiff appeared "somewhat depressed" when he saw Dr. Noonan and complained of fatigue and exhaustion but denied dyspnea. (Tr. 148). The list of medications Plaintiff was taking at the time did not include any antidepressants. Id. Dr. Noonan was concerned that Plaintiff's fatigue might be due to the beta blocker quality of his blood pressure medication, Labetalol. Id.

In May 2001, Plaintiff complained to Dr. Yamada of fatigue, depressed mood and irritability, but Dr. Yamada concluded that he was psychologically stable. (Tr. 177). In July 2001, there was no mention of a depressed mood. (Tr. 182). In September 2001, Plaintiff complained of being depressed, difficulty enjoying his usual activities, irritability, lack of energy and some anxiety. (Tr. 185). Dr. Yamada diagnosed Plaintiff with depression with some anxiety and again prescribed Wellbutrin. Id. The next month, Dr. Yamada increased the dosage of Wellbutrin and indicated that Plaintiff would be referred to a psychiatrist if his symptoms did not improve. (Tr. 186). In November 2001, Dr. Yamada decreased the dosage of Wellbutrin and also prescribed Paxil. (Tr. 189). In February 2002, Dr. Yamada noted that Plaintiff stopped taking these medications six weeks earlier and that he was depressed, had decreased energy and decreased concentration. (Tr. 191). In May 2002, Plaintiff agreed to go for a psychiatric examination. (Tr. 194). In June 2002, Dr. Yamada's nurse practitioner issued two notes. The first note reported that Plaintiff was unable to work for two weeks starting June 14, 2002 due to depression with anxiety (Tr. 197) and the second

indicated a similar inability to work for about one week from June 28, 2002 to July 2, 2002. (Tr. 198). Plaintiff indicated that he did not work after that time.

Plaintiff reportedly saw a psychiatrist, Dr. Richard Gevalia, on occasions between July and December 2002, but did not submit any of Dr. Gevalia's records (although the ALJ held the record open to allow him to do so). (Tr. 362). In August 2002, Dr. Yamada noted that Plaintiff had been seeing a psychiatrist but was not taking any medication for his depression. (Tr. 199). According to Dr. Noonan's treatment note from September 2002, Plaintiff was not taking any antidepressants at that time. (Tr. 152). In October 2002, Plaintiff indicated that he wanted a referral to another psychiatrist because his current psychiatrist was advising him to decrease drinking and had not prescribed any medications. (Tr. 200). When Plaintiff initially saw Dr. James Whalen, another psychiatrist, he did not disclose recent psychiatric care – only that he had such treatment briefly in 1999 but stopped because he did not want to be on medication. (Tr. 226).

Dr. Whalen initially evaluated Plaintiff on December 13, 2002. (Tr. 224-227). Plaintiff described a nine-year history of feelings of hopelessness and a history of depressive symptoms since his heart surgery in 1998. (Tr. 224). Plaintiff also reported weight gain and consumption of six to eight beers per day. (Tr. 224, 225, 227).

Dr. Whalen observed that Plaintiff was alert and fully oriented; that his intellectual functioning, memory, judgment and insight were intact and that his attitude was pleasant. (Tr. 225). Plaintiff's mood was sad and depressed and his affect was flat or depressed. Id. Plaintiff's speech had a low rate and rhythm and there was no abnormality in his thought process, although he

-15-

demonstrated a poverty of thought. Id. The medications that Plaintiff was taking did not include any antidepressants. (Tr. 226).

Dr. Whalen's initial diagnosis R/O dysthymia; R/O single episode major depressive disorder ("MDD"); R/O "double" depression (dysthymia and MDD); R/O alcohol dependence; and R/O substance-induced mood disorder. (Tr. 227). Dr. Whalen opined that Plaintiff's current global assessment of functioning ("GAF") was 70-75 and that the highest that it had been in the past year was 80.[1] Id. Dr. Whalen's initial treatment plan did not include any antidepressant medication but involved weight loss and daily exercise, and he intended to address Plaintiff's alcohol use at their next meeting. Id.

In January 2003, Dr. Yamada's nurse practitioner noted that Plaintiff was taking 50 mg. of an antidepressant, Zoloft. (Tr. 205). In February 2003, Plaintiff saw Dr. Whalen for fifteen minutes and told him that his employment had been terminated but that he was still on temporary disability benefits and that he was drinking less (only a couple of beers on weekends). (Tr. 228). Dr. Whalen noted that Plaintiff was discouraged about the loss of his job and had a depressed affect without suicidal or homicidal ideation but that he was fully oriented, and his speech, mood and behavior were grossly normal. Id. Dr. Whalen increased the dosage of Zoloft prescribed for Plaintiff. Id.

---

[1] A GAF rating between 61 to 70 reflects some mild symptoms such as mild depression or mild insomnia or some difficulty in social, occupational or school functioning but generally functioning pretty well and having some meaningful interpersonal relationships and a rating between 71 and 80 indicates a situation in which if symptoms are present, they are transient and expectable reasons to psychosocial pressures and result in no more than a slight impairment in social occupational or school functioning. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994). The higher the rating is within a given range, the less severe is the difficulty.

-16-

On April 4, 2003, Plaintiff completed a daily activities form in connection with his DIB and SSI claims. (Tr. 87-92). Plaintiff reported that he did light house cleaning including making the bed and sweeping the floor but that he took rest breaks when doing so, did light yard work, walked daily, and occasionally went grocery shopping once a week or as needed. (Tr. 87-89). He reported that he does not need help with the grocery shopping except for heavy items. (Tr. 89). Plaintiff reported that he visits family for breakfast for an hour about once a week. (Tr. 91). On April 10, 2003, Plaintiff saw Dr. Whalen for a routine fifteen-minute visit and told him that he was still having a few beers with his friends on weekends, and he did not show a clear response to the Zoloft. (Tr. 229). Dr. Whalen increased the dosage of Zoloft again and advised Plaintiff to refrain from drinking. Id.

In June 2003, a psychologist, Carol McKenna, Ph.D., reviewed Plaintiff's medical records including Dr. Whalen's medical reports (Tr. 31, 250) and prepared a Psychiatric Review Technique Form ("PRTF") (Tr. 238-251) and a mental RFC assessment (Tr. 252-254) detailing her assessment of the functional limitations resulting from Plaintiff's depression. Dr. McKenna concluded that Plaintiff suffered from an affective disorder and substance addiction disorder. (Tr. 238, 241, 246). She opined that the combined impact was a mild restriction of daily activities, mild difficulty maintaining social functioning and moderate difficulty maintaining concentration, persistence, and pace. (Tr. 248). Dr. McKenna opined that Plaintiff's depression resulted in only moderate limitation in his ability to understand, remember and carry out detailed instructions and maintain attention and concentration for extended periods, but that it did not result in any limitation in being able to understand, remember and carry out short, simple instructions. (Tr. 252). She concluded that Plaintiff could complete simple tasks within the parameters of his physical limitations. (Tr. 254).

-17-

In July 2003, Plaintiff again completed a report regarding his daily activities. (Tr. 99-104). Again, he reported that he worked around the house and yard and occasionally went shopping, but that he took rest periods. (Tr. 99). He reported that he did chores such as making the beds, vacuuming and cleaning the house for thirty or forty minutes at a time, and that his wife prepared his meals, despite the fact that she worked during the day and he was home alone. (Tr. 100). He reported that he went shopping once or twice a week, that he went to weekly mass and that he visited friends and family. (Tr. 101, 103).

That same month, Dr. Whalen completed an "Emotional Impairment Questionnaire" (Tr. 257-258), an RFC form (Tr. 259-260) and a summary of Plaintiff's psychiatric disorder. (Tr. 221-223). Dr. Whalen indicated that Plaintiff suffered from recurrent major depressive disorder and a history of alcohol abuse/dependence and that his GAF was "65 (70-75)". (Tr. 221). Dr. Whalen noted that Plaintiff had a very depressed mood, lacked energy and opined that Plaintiff had been able to function only at a low level for the last four years, although he continued to work until June 2002. Id. Dr. Whalen noted that no psychological testing had been performed. (Tr. 222). Thus, his opinion that Plaintiff had significant lack of energy and motivation, that Plaintiff's subjective depression limited his usual functioning, and that this was a "large change from [his] prior level of functioning" (Tr. 221) was based only on Plaintiff's subjective reports. Dr. Whalen reported that Plaintiff was clearly withdrawn, but not hostile or belligerent, and had a positive attitude, although he was dysphoric. (Tr. 222).

In August 2003, Dr. Edwin Davidson reviewed Dr. Whalen's questionnaire responses (Tr. 273) and completed a PRTF (Tr. 261-274) and a mental RFC assessment. (Tr. 275-277). Dr.

-18-

Davidson concluded that Plaintiff would have difficulty with complex tasks but should be capable of simple tasks in an unpressured setting. (Tr. 277).

Dr. Whalen opined that Plaintiff suffered from "moderate +" severe dysphoria, anergia and decreased interests and that he could not sustain competitive employment on a full-time, ongoing basis. (Tr. 257-258). Dr. Whalen also opined that Plaintiff's interests were moderately severely constricted, and that Plaintiff had a moderately severe impairment in his ability to relate to others and to respond appropriately to supervisors or co-workers. (Tr. 259). Dr. Whalen further opined that Plaintiff had a moderately severe limitation in his ability to perform varied tasks but that his ability to perform complex tasks was only moderately limited, that his ability to perform repetitive tasks was only mildly limited, and no limitation in performing simple tasks. (Tr. 260).

In September 2004, after having seen Plaintiff seven more times since June 2003 for routine visits (Tr. 293-299), Dr. Whalen reported that Plaintiff's diagnosis was moderate to severe recurrent major depression and opined that he could not sustain competitive employment on a full-time, ongoing basis. (Tr. 302-303). Dr. Whalen also completed another questionnaire about Plaintiff's RFC based upon his psychiatric condition. (Tr. 300-301). Dr. Whalen opined that Plaintiff had a moderately severe limitation in his ability to perform complex tasks but that his ability to perform repetitive tasks was only moderately limited, and his ability to perform varied or simple tasks was only mildly limited. (Tr. 301). He also indicated his belief that Plaintiff had only a moderate constriction of interests and that the limitations on his ability to relate to coworkers and respond to work pressures was moderately severe, but that his ability to relate to others, to understand,

-19-

remember and carry out instructions and to respond appropriately to supervision was only moderately limited.  (Tr. 300).

Plaintiff's attorney arranged for a psychologist, Dr. James Curran, to examine Plaintiff on October 4, 2004, and to prepare a report to be used in the October 8, 2004 hearing.  (Tr. 305).  Although Plaintiff's expression appeared sad, he was alert and his motor behavior was within normal limits and rapport and eye contact with Dr. Curran was good.  Id.  Plaintiff told Dr. Curran that he saw Dr. Whalen "about every 4-5 weeks" (Tr. 306) although Dr. Whalen's records show a short routine visit once every two or three months.  Plaintiff reported that he does housework, such as washing the dishes, vacuuming, cleaning and making dinner, but that he has no motivation.  (Tr. 307).  Dr. Curran diagnosed recurrent major depressive disorder, anxiety disorder not otherwise specified, a simple phobia for lightning, alcohol abuse in early remission and opined that Plaintiff's GAF was 45.  (Tr. 308-209).[2]  Dr. Curran opined that as a result of his psychological condition, Plaintiff was moderately severely or severely limited in almost all areas of functioning, including performing even simple tasks.  (Tr. 310-311).

At Plaintiff's hearing, the ALJ asked the VE if there were jobs that could be performed by a person of Plaintiff's age with his educational and vocational experience who was limited to light work and whose attention and concentration allowed for the performance of simple work tasks over an eight-hour day with normal breaks and complex or detailed tasks no more than occasionally, who had to interact with the public no more than occasionally and did not require more than the exchange

---

[2] A GAF rating between 41 and 50 is indicative of serious symptoms or serious impairment in social, occupational or school functioning.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).

of work-related, non-personal information, who did not have to engage in work-related interaction with coworkers constantly or in a physically close setting, and where close, frequent or continuous supervision was not required. (Tr. 390-391). The VE testified that there were a number of light, unskilled jobs that such a person could perform. (Tr. 392). The VE testified that the jobs would include work as an assembler with about 5,700 positions in Rhode Island and southeastern Massachusetts, a hand packager with about 2,500 positions locally, and an inspector with about 1,600 positions in that area. Id.

A.     **The ALJ Did Not Fail to Give Sufficient Weight to the Opinion of Dr. Whalen**

Plaintiff cites one error in this appeal. Plaintiff concedes that he has the physical capacity to perform light work as found by the ALJ. However, Plaintiff contends that the ALJ erred in not giving the opinion of Dr. Whalen, a treating psychiatrist, substantial, if not controlling, weight as to the impact of Plaintiff's depression on his ability to work. As noted above, Dr. Whalen was Plaintiff's treating psychiatrist starting in December 2002, (Tr. 224), and he ultimately opined in September 2004 that Plaintiff could not sustain competitive employment on a full-time, ongoing basis. (Tr. 302-303). However, in June 2003, Dr. Whalen found Plaintiff's GAF to be "65 (70-75)" (Tr. 221) and, in December 2002, it was "70-75" with a high in past year of "<80" (Tr. 227), which indicates only mild to transient symptoms.

In his decision, the ALJ found that Plaintiff suffered from "severe" (20 C.F.R. §§ 404.1520 and 416.920) depression and assessed an RFC to perform light work with a moderate impairments in the ability to maintain attention and concentration, and the ability to deal appropriately with the public, coworkers and supervisors. (Tr. 27 at Findings 3 and 6). Based on this RFC and the VE's

-21-

testimony, the ALJ found that Plaintiff was not disabled. The ALJ thoroughly evaluated the mental

health treatment evidence (Tr. 19-22, 23-24), and the totality of the record supports his assessment

of Dr. Whalen's opinion. The ALJ correctly noted that Dr. Whalen's total disability opinion was

inconsistent with his prior GAF assessments and inconsistent with Plaintiff's reported activities of

daily living. (Tr. 24). The ALJ also accurately pointed out several inconsistencies between Dr.

Whalen's assessments and the record, as well as a couple of internal inconsistencies in Dr. Whalen's

own assessments. Id. Finally, the ALJ gave "only reduced evidentiary weight" to the eleventh-hour

disability opinion of Dr. Curran as lacking in objectivity, and the ALJ found Plaintiff's own

testimony regarding his limitations to be "not totally credible" for several reasons stated in the

decision. (Tr. 22-25). Plaintiff does not challenge these latter two conclusions on appeal, and thus

they are considered supported by the record and entitled to deference. See Frustaglia, 829 F.2d at

195.

Dr. Whalen's opinion, as that of a treating psychiatrist, is entitled to controlling weight if it

is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2). An ALJ

must give "specific reasons for the weight given to the treating source's medical opinion, supported

by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons

for that weight." Social Security Ruling ("SSR") 96-2p. The ALJ in this case provided a thorough

and detailed explanation of his specific reasons for declining to give controlling weight to Dr.

Whalen's disability opinion, and such reasons are supported by substantial evidence of record. Thus,

-22-

the ALJ's analysis comports with the requirements of the treating physician rule, and his assessment of Dr. Whalen's opinion is entitled to deference.

Here, the ALJ considered all of the evidence of record and determined that it did not support Dr. Whalen's disability opinion. In fact, the ALJ looked behind Dr. Whalen's conclusory disability opinion (Tr. 303) and closely examined the entirety of his records of treatment. For instance, the ALJ noted that Dr. Whalen indicated that Plaintiff had been "low functioning" (i.e., "unable to function outside of a highly structured living and/or day treatment setting for two or more years") since his July 1998 heart valve replacement surgery. (Tr. 221). However, at the same time, Dr. Whalen assessed Plaintiff's GAF as "65 (70-75)," and the record reflects that Plaintiff was able to work for approximately four years after his heart surgery which contradicts Dr. Whalen's indication of long-term "low functioning." It should also be noted that the ALJ did not entirely reject Dr. Whalen's opinion in making his RFC assessment. The ALJ found moderate impairments in two respects as to mental functioning which he concluded were supported by the record as a whole. The ALJ provided sufficient reasons for giving reduced weight to Dr. Whalen's opinions, and his RFC assessment is supported by substantial evidence. Finally, the ALJ's RFC assessment is consistent and, in fact, more limiting in some respects than the opinions rendered by the psychological consultants, Dr. McKenna and Dr. Davidson. See Exs. 16F and 19F.

## VI.   CONCLUSION

For the reasons stated above, I order that the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Document No. 8) be GRANTED and that Plaintiff's Motion for

Summary Judgment (Document No. 7) be DENIED.  Final judgment shall enter in favor of the

Commissioner.

LINCOLN D. ALMOND
United States Magistrate Judge
July 26, 2006